UNITED STATES of America

v.

Lester Clark DEAN, et al.

No. 86–396–CR–T–17.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 22, 1993.

Patricia Kerwin, Asst. U.S. Atty., for U.S.

Vincent Alto, for claimants Burns.

## ORDER

KOVACHEVICH, District Judge.

This cause is before the Court on petition of Leroy and Myrtice Burns objecting to the government's forfeiture claims to certain property, to which they assert ownership, pursuant to the plea agreement between the government and Lester Clark Dean.[1] The Court held an evidentiary hearing on the petition on March 23, 24, and 26, 1992.

### PROCEDURAL BACKGROUND

On October 15, 1986, a sealed indictment was filed in this case and later superseded on December 12, 1986. Among the thirteen (13) defendants named in the superseding indictment were Lester Clark Dean and Leroy Burns, and, on January 7, 1987, both entered not guilty pleas to the charges. Mr. Burns was represented by Frank Louderback, Esquire.

Within a few days of the superseding indictment, the government filed notice of lis pendens in regard to forfeiture proceedings on various properties purportedly owned by the several defendants. Included therein were lis pendens for forfeiture of real property or proprietary interests of Leroy Burns (Docket No. 19) and forfeiture of proprietary interest of High Seas Restaurant (Docket No. 26).

On March 17, 1987, a plea agreement was entered into between Lester Clark Dean and the government (Docket No. 227). Lester Clark Dean was sentenced on August 15, 1988, to twelve (12) years minimum mandatory on Count 1 and five (5) years on Counts 14, 15, 16, and 17, to run concurrent with each other and concurrent with Count 1. The judgment included "Order Regarding Forfeiture". (Docket Nos. 517, 518, and 524).

On February 1, 1988, this Court granted the government's motion for dismissal of charges related to Leroy Burns (Docket No. 437). Mr. Burns, on August 12, 1988, filed an objection to the attempted forfeiture and asked for a probable cause hearing. (Docket No. 502). Along with other petitioners, Leroy and Myrtice Burns filed a petition to adjudicate the validity of their interests in certain forfeited properties on November 25, 1988. (Docket No. 563). A petition regarding the High Seas Restaurant was also filed by Robert P. Fusco, individually and as owner, (Docket No. 668), but this petition is not an issue before the Court at this time.

The Court scheduled a hearing on the forfeitures involving Leroy and Myrtice Burns on December 19, 1988. At that time, a co-defendant, Michael Giltner, having an appeal pending, refused to testify on the issues in that hearing and made a Fifth Amendment claim. The parties agreed that Mr. Giltner was essential to the resolution of the issues and agreed to postpone the hearing until after resolution of the Giltner appeal. The Court entered an order granting a stay of forfeiture proceedings on January 3, 1989 (nunc pro tunc to December 19, 1988, Docket No. 700).

On January 30, 1989, the government moved for an order of interlocutory sale of real property associated with the High Seas Restaurant and adjacent real property because its value was rapidly depreciating while the stay was in effect. (Docket No. 712). The motion was granted on February 24, 1989, after a hearing on the motion on that date and consent to its entry from the petitioners. (Docket Nos. 725 and 728). On August 28, 1989, the U.S. Marshal sold the restaurant for $850,000.00 and $536,524.20 was placed in an interest bearing account with the registry of the Court. On November 12, 1991, the Court granted the United

1. Myrtice Burns, the wife of claimant Leroy Burns, is now deceased and Mr. Burns additionally is acting as the representative of her estate.

States' motion to lift the stay of forfeiture proceedings and a hearing was scheduled as soon as practicable.

Following the evidentiary hearing in March 1992, Mr. Burns filed a motion for final summary judgment and proposed findings of fact and conclusions of law on May 26, 1992. (Docket Nos. 930, 931, and 932). The government's responses to those pleadings were filed on August 21, 1992, along with a memorandum in support of the requested forfeitures. (Docket Nos. 950, 951, and 952). The Court previously, on March 29, 1993, denied Mr. Burns motion for final summary judgment. (Docket No. 1002).

The following issues are before this Court at this time:

1) Whether Leroy and Myrtice Burns have shown by a preponderance of the evidence that they have a legal right, title, or interest in the High Seas Restaurant which was vested in them rather than in Lester Clark Dean? or 2) whether Leroy and Myrtice Burns have shown by a preponderance of the evidence that they are bona fide purchasers for value who were reasonably without knowledge that the High Seas Restaurant was subject to forfeiture? and 3) if either question is answered in the affirmative, what is the Burns' percentage of net ownership interest in the High Seas Restaurant?

Based on the proceedings herein, including the evidentiary hearing, the Court makes the following findings of fact and conclusions of law:

*FINDINGS OF FACT* [2]

1. Frank Louderback, Esquire, testified at the evidentiary hearing after Mr. Burns waived his attorney-client privilege. Mr. Louderback represented Leroy Burns beginning in about June or July 1985, when they initially became aware of a criminal investigation in which Mr. Burns was a possible target. An indictment, against Mr. Burns and others was issued in October 1986, but not unsealed until December 1986. Mr. Louderback continued to represent Mr. Burns for approximately two (2) years until the conclusion of the criminal case against Mr. Burns.

2. The indictment charged conspiracy to import marijuana and alleged overt acts by Mr. Burns, including a cash deposit of $51,-000 into the Palmetto Savings and Loan Association in July 1976. Mr. Burns claimed to Mr. Louderback that the questioned deposit came from savings, his wife's former marriage, and the death of his and/or her parents. Mr. Burns did not produce any documents to show Mr. Louderback that he had saved the $51,000.00. A $5,000.00 cash retainer was paid to Mr. Louderback in July 1985, in bills ranging from $20.00 to $100.00 denominations. Following the first appearance, Mr. Burns remitted a cashier's check for $25,000.00, drawn on Goldome Savings Bank of St. Petersburg, to pay for representation up to trial, making a total of $30,000.00 paid for representation.

3. Mr. Louderback never represented Mrs. Burns but he talked to her. Mrs. Burns confirmed to Mr. Louderback that the $51,000.00 deposit was money accumulated by her and Mr. Burns, but, again, she produced no records in confirmation of her statements.

4. Mr. Louderback's recollection was that Mr. Burns refused all plea offers without hesitation and always indicated he would go to trial. Ultimately, the government moved to dismiss the indictment.

5. Louise Cummings, the daughter of Mr. Burns by his first marriage, testified. Ms. Cummings had lived with Leroy Burns (father) and Myrtice Burns (stepmother) during her tenth (10th) to nineteenth (19th) years. Her stepmother handled the family money and Ms. Cummings considered Mrs. Burns to be very frugal.

6. After she left her father's home, Ms. Cummings lived around and in Bradenton for eight (8) years. She never received any money or financial support from the Burns during this period of time. She did visit the Burns approximately once a week.

**2.** This Court notes that this order was prepared without the benefit of an official transcript as one was not provided by either party; therefore, no citations to the record are included.

7. When Myrtice Burns became ill, Ms. Cummings would often come from Ormand Beach to help out. Her stepmother died in January 1991 and Ms. Cummings cleaned up the house afterwards. During the cleaning, Ms. Cummings stated that she found approximately $2,000.00 cash in "things", i.e. shoes, coats, in denominations ranging from $5.00 to $100.00 bills. This was no surprise to her; she "knew" it would be there because her stepmother always put money away. From an early age, her father told her he had savings but she didn't know where he saved the money.

8. Ms. Cummings is also stepsister to Lester Clark Dean. Sometime in the 1970s, she learned that Dean was a fugitive on drug charges. This occurred about the time the news was published in the newspaper.

9. Ms. Cummings is a notary public and notarized various documents for Mr. Pratt. Specifically, she notarized the addendum to mortgage deed (Government's Exhibit No. 87). Signing before her, in 1976, for By–Gill Corporation was her stepbrother, Lester Clark Dean. The mortgage was satisfied October 6, 1983, the total mortgage being $85,000.00. The mortgage document was not recorded until March 4, 1986.

10. The deposition of Myrtice Burns, taken prior to her death, on February 8, 1991, was read into the record. Mrs. Burns stated that they (she and her husband) saved all of the $51,000.00 deposit in question and that her son, Lester Clark Dean, made no contribution to that deposit. She also stated she had no knowledge of drug money being put into the High Seas Restaurant.

11. Leroy Burns worked for Mr. Warren McLeod, as a swing foreman, for between fifteen (15) and eighteen (18) years in bridge construction at Bay Dredging and Construction. Mr. Burns also "moonlighted" in Mr. McLeod's home, building cabinets, etc. Mr. McLeod knew Mr. Burns for twenty (20) to twenty-five (25) years. Mr. Burns got top line pay at the construction company.

12. Mr. McLeod found Mr. Burns to be a good worker and very dependable and to his knowledge Mr. Burns had a reputation for honesty and truthfulness.

13. Mr. Roy Baden was the Sheriff of Manatee County from about 1941 until 1960, eighteen (18) years. He knew Leroy Burns since he was a teenager, prior to becoming Sheriff, but lost track of Burns for several years after he became Sheriff. Mr. Baden was also a mortgage lender for sixteen (16) years at Manatee Federal Savings and Loan Association and he became reacquainted with Mr. Burns through that job.

14. Mr. Baden's bank was the lender of $120,000.00 to Mr. Burns for the building of the High Seas Restaurant. Collateral for that loan consisted of paid-for property, savings accounts and/or certificates of deposit at Palmetto Federal and cash. (Petitioner's Exhibit No. 8 and Government's Exhibit No. 93). Mr. Baden had no knowledge of where Mr. Burns got the remainder of the money to build the restaurant ($155,350.00 cost minus $120,000.00 loan).

15. Mr. Baden testified that he felt that Mr. Burns was truthful and honest.

16. Mr. Burns moved to Manatee County in 1934. After World War II, he became a carpenter and then in about 1939 he began doing construction work and he continued at that occupation until he was injured in 1976.

17. Mr. Burns' first marriage lasted from 1946 until they divorced in 1951.

18. It was Mr. Burns testimony that by November 1958, he had saved $17,000.00. This money was in cash and he gave it to his mother to keep for him in her house, not in a bank. His mother kept the money in a mattress in her house according to Mr. Burns. This money or other money remained with his mother, in her mattress, until her death in 1977.

19. In or about 1958, Mr. Burns married Myrtice Dean, a widow with two children. The first house the couple lived in, from 1958 until 1979, was Mrs. Burns' house from her first marriage. Mr. Burns built a house while dating Myrtice, but Myrtice refused to move in the house with Mr. Burns, so he sold the house four (4) years later. The house was constructed in 1958 and was sold in 1962. Mr. Burns made a profit of $10,000.00 which he gave to his mother to keep. He testified that over time he would give his mother

money in small and large bills, to keep for him.

20. Lester Clark Dean's father died in 1957. At that time, the father owned a service station. After his father's death, the station was liquidated. There was some vague reference that Mrs. Burns may have netted some money from this sale but no evidence was presented to prove she had or, if she had, how much she received. Thereafter, she drove a school bus and worked in the school cafeteria for twenty-nine (29) years, retiring at 62 in about 1981.

21. After their marriage, Myrtice took Leroy's paychecks to save and they lived on her checks. Myrtice saved small bills all over the house, converted them to larger bills later and then gave them to Mr. Burns, who would hide the cash behind the wood paneling in the house. Myrtice knew all Mr. Burns hiding places for putting money but he was not aware of all her "hidey-holes." Mrs. Burns opened up most of the bank accounts and sometimes Mr. Burns found out about them only after the fact. Over the years, Mr. Burns stated he would take out home improvement loans and car loans to keep his credit up even when he had the cash to pay for the purchase.

22. The couple was frugal and their spending habits were minimal-no drinking, no smoking, etc. Mostly, Mr. Burns stated they spent just enough to live on without frills. For instance, the couple took only one vacation during their marriage, in 1961 for one week. Mr. Burns did own various boats during the marriage.

23. Lester Clark Dean was nine (9) years old at the time of Leroy's marriage to Myrtice. Dean lived with them until about 1971, when he and his stepfather argued concerning Dean working under Burns' supervision at the construction company and Dean quit the job. Dean disappeared until about the end of 1976, after Leroy was injured on the job. Mr. Burns did not hear from Dean in those four (4) years and did not believe Mrs. Burns had heard from him either. During this time, Dean did not correspond with Mr. Burns but he did see Myrtice Burns, his mother, at his grandmother's funeral in Georgia. He stated he never gave his mother any money during the time he was gone.

24. Mr. Burns had several large personal expenditures from 1976–1979. In 1975, Burns bought an airboat for $3,450.72 (Government's Exhibit No. 50), and spent $5,320.95 on construction work (Government's Exhibit No. 55). In 1977, he bought two lots with a mobile home for $12,000.00 (Government's Exhibits Nos. 52 and 54). In 1978, Burns bought two lots with a mobile home for $8,000.00 (Government's Exhibit No. 53). In 1979, Burns purchased an airboat for $5,500.00 (Government's Exhibit No. 51).

25. Lester Clark Dean disappeared between 1971 and 1976 and Mr. Burns heard rumors he was wanted on drug charges. Sometime in the 1970s, Myrtice's parents died and she attended their funerals in Georgia, Mr. Burns did not attend. Although Mr. Burns stated that Mr. Dean did not contact his mother between 1971 and 1976, he also admitted that she may have seen him at one or both of the funerals.

26. On June 14, 1976, Mr. Burns sustained a back injury on the job and felt that his future in construction work was questionable. Therefore, he testified, on June 18, 1976, he made a $51,000.00 cash deposit in Palmetto Savings and Loan Association. The cash came from money he and Myrtice had been saving behind the paneling in their home. He intended only to put in $50,000.00, so it would be federally insured, but he miscounted. He took the money from the paneling because he was afraid if he waited he would not be able to physically remove the money and he wanted Myrtice to have access to the money. He put the money in a passbook account with access given to self, wife and kids; this access apparently included Lester Clark Dean, although he had supposedly disappeared four (4) years earlier and was purportedly not in touch with the Burns family. Certain deposits and withdrawals were made in that account during the period following that deposit, $15,000.00 cash and $16,000.00 in checks in deposits in 1975 and more than $21,000.00 in checks in 1976. (Government's Exhibit No. 2).

27. At the time of depositing the $51,-000.00 in 1976, Mr. Burns stated he may have told several people, including Mr. Richmond the attorney doing his and/or Dean's taxes, that he found $60,000.00.

28. In about 1976, Lester Clark Dean returned to Florida and pled guilty to state drug charges, this occurred in the latter part of 1976. In an earlier deposition, Mr. Burns stated that to his knowledge Lester Clark Dean "did nothing and ran all over the world", but, at this hearing, he stated he understood Dean worked but didn't know as what or if he did.

29. Between June 17 and 20, 1976, withdrawals of $4,500.00 were made from that account. After that, withdrawals of $500.00 a month were made from 1976 to 1979 supposedly to supplement Mr. Burns worker's compensation checks and bring them up to the level of his previous earnings. (Petitioner's Exhibit No. 1).

30. Mr. Burns stated that none of the money deposited was from outside sources or drug proceeds.

31. Mr. Burns decided he needed to make provisions for an income, since it did not look like he would return to construction; he was still on a walker and wearing a back brace. He decided that a good investment might be the construction and rental of mini-storage units. For advice he consulted with Jerome Pratt, Esquire. Mr. Pratt had advised him on his disability and worker's compensation problems and was a respected member of the community. Mr. Pratt had been little league coach for Lester Clark Dean.

32. Mr. Pratt said he needed someone with good credit and a little money to buy some land and build a restaurant. Therefore, after persuasion from Mr. Pratt, Mr. Burns abandoned the idea of the mini-storage and bought land for the restaurant. The property, which was found by Mr. Pratt, cost $60,000.00 and Mr. Burns put down $6,000.00 by giving it to Mr. Pratt. To finance the remaining $54,000.00, Mr. Burns put up his savings accounts and/or certificates of deposit as collateral on a loan from Palmetto Federal Savings and Loan (later known as Goldome Savings Bank). The $54,000.00 loan proceeds check (Petitioner's Exhibit No. 4) was endorsed to Jerome Pratt's trust account on June 13, 1977. (Petitioner's Exhibits Nos. 2 through 6). The interest on the loan, which Burns would pay, was the difference between the interest on the savings accounts and/or certificates of deposit to be paid to Mr. Burns, and, the loan rate of 9 and ½%. The loan was repaid in 1983 when the High Seas Restaurant was sold by By–Gil Corporation and Mr. Pratt. The proceeds of the sale were used to repay the loan and only then did Mr. Burns have access to his collateral.

33. Mr. Burns also borrowed $120,000.00 from Manatee Federal Savings and Loan Association, on July 15, 1977, for building the restaurant. The interest rate was 9 and ¼% with payments of $1099.05 monthly beginning April 15, 1978, for twenty (20) years. (Petitioner's Exhibit No. 8). The original purchase price was calculated on the loan settlement statement at $155,350.00 *including* closing costs. The bank required $39,-503.00, the difference between the mortgage amount and the original purchase price, to be placed in escrow at the time of closing. Mr. Burns stated he did not pay these costs and felt they were probably paid by Mr. Pratt, who handled all finances for the restaurant. Mr. Burns was the only borrower on this loan, not his wife, and was responsible for repaying the $120,000.00. Mr. Burns claims to have made all mortgage payments until the restaurant was sold in 1989, after forfeiture. The government reimbursed Mr. Burns for the payments made from January to July 1989, per their agreement with Mr. Burns (Petitioner's Exhibits Nos. 9 through 11). A total of $150,350.00, which represents the mortgage amount plus the escrow amount minus closing costs, was given to Mr. Pratt, and subsequently to J.J. Holland Construction Company by Mr. Pratt (Government's Exhibit No. 34).

34. In April 1977, Burns signed a contract to purchase two parcels of land for $75,000.00 plus interest (Government's Exhibit No. 24). The contract called for a $7,500.00 deposit, $15,000.00 to be paid within thirty days (30) and the remainder of $52,-500.00 to paid together with interest within

one (1) year. Two Pratt trust checks were remitted as a down payment; the first for $7,500.00 dated April 25, 1977, bearing the notation "for 'Burns'" and the second for $18,000.00 dated May 26, 1977, bearing the notation "for 'Leroy Burns.'" The balance was paid with ten (10) cashiers checks ranging from approximately $3,500.00 to $9,000.00. The payments were made during the period between January 1978 and February 1979 (Government's Exhibit No. 24).

35. Michael Giltner also invested in the High Seas Restaurant. He invested $12,-000.00 in alleged proceeds from the sale of a bar that he had owned. Additionally, in September 1978, Mr. Giltner obtained a $40,-0000.00 loan for the restaurant from Kathryn Schimanski, whose son Giltner knew to be involved in drug trafficking. Giltner admitted that the loan may have been drug proceeds. (Arlene Bykeefer Dean was also indebted on the loan through By–Gil Corporation). Mr. Giltner claimed that the loan was fully repaid and that no drug proceeds ever went in the restaurant to his knowledge, nor did he ever give any drug proceeds to Leroy Burns. At sometime, Giltner approached Jerome Pratt to discuss land to open a bar but Pratt told him the land was too close to a neighborhood for a bar, that Giltner didn't have enough money for the project and that he should put up a restaurant instead.

36. During the construction of the High Seas Restaurant, in late 1977 and into 1978, Mr. Burns visited the site regularly to see "if they were doing as they should." He only visited as he felt able and didn't participate in the construction.

37. Mr. Pratt also took Mr. Burns to the County Bank to borrow money for furnishings for the restaurant. He borrowed $87,-000.00 at 8 and ¼% interest. The monthly payments were $1,000.00 starting November 10, 1978, for fifty-nine (59), months with a balloon payment of $59,633.61 due on October 10, 1983. (Petitioner's Exhibits Nos. 15 and 17). The signatories to that loan were Jerome Pratt and Leroy Burns. Mr. Burns testified that he made all the monthly payments and that Mr. Pratt paid the balloon payment. It was not clear when the balloon payment was made but it may have been made following the sale of the High Seas Restaurant to Mr. Fusco.

38. Additionally, Mr. Burns signed a guaranty for the purchase of the restaurant equipment from Whitlock–Dobbs. The original purchase price of the equipment was approximately $115,000.00. The difference between the loan amount and the original purchase price, $28,825.93, was paid by six checks from Pratt's trust account (Government's Exhibit No. 48).

39. The High Seas Restaurant was leased to By–Gil Corporation on October 24, 1978, for ten (10) years. By–Gil Corporation was, of record, owned by Michael Giltner (co-defendant to Lester Clark Dean in the criminal case) and Arlene Bykeefer Dean. Arlene Bykeefer Dean was Lester Clark Dean's designee. Dean could not have a liquor license in his name because of his prior convictions. By–Gil put down a security deposit of $110,-000.00 and made monthly rent payments in the amount of $5,400.00 until the restaurant was sold in 1983 to Fusco. They were also to pay Mr. Burns 1% of the gross receipts, but he testified he never received those payments. There is no evidence that Mr. Burns made any attempt to resolve this issue with By–Gil and to get the payments which he alleges were due to him. The restaurant grossed 1 and ½ million dollars the first year.

40. Mr. Burns visited the restaurant once a month to get his check and see that everything was "staying in place." The $5,400.00 paid his loan payments of $1,000.00 and $1,099.00, taxes and flood insurance. (Petitioner's Exhibits Nos. 39 A and B). Mr. Burns testified he paid property taxes of about $40,000.00 over the years on the restaurant.

41. In 1978, in order to get a liquor license, more property was purchased to extend the restaurant's available parking. The additions were to be paid for by the lessee, By–Gil Corporation.

42. In latter 1978, Mr. Burns stated that he heard rumors that By–Gil Corporation and Jerome Pratt were involved in "corruptible businesses". He further stated that he had no knowledge, either then or to date of

hearing, that drug proceeds were used in the High Seas Restaurant.

43. In 1983, By–Gil Corporation and Jerome Pratt sold the High Seas Restaurant to Robert Fusco for a sale price of $2,000,000.00. Mr. Burns gave Mr. Pratt a power of attorney to conclude the sale, as he was taking his wife to a doctor in either Tennessee or South Carolina. Fusco made a down payment of $225,000.00, of which Mr. Burns apparently received payments of $10,124.00 and $23,000.00 on October 18, 1983. The money was deposited in his passbook account at Goldome Savings Bank. (Petitioner's Exhibits Nos. 23–25).

44. Mr. Fusco stopped making payments on the restaurant in about 1985. Mr. Burns hired Bob Rosen of Sarasota and Hugh McGuire of Bradenton to foreclose on Mr. Fusco. He paid these attorneys $16,000.00 in fees, but the foreclosure was dropped after he reached an agreement with Mr. Fusco. Later after the dismissal of the indictment against him he had to foreclose again and Mr. Fusco filed for bankruptcy. He paid the firm of Strichter and Reidel $2,200.00 to fight the bankruptcy. He also sued By–Gil Corporation, using Mr. Chastain and Mr. Rosen as counsel, at a cost of $6,000.00–7,000.00. The petitioner failed to make it clear what this lawsuit entailed, but it was also filed after the dismissal of the indictment.

45. Mr. Burns denied he was ever represented by Attorney Richmond. He stated that he met with Mr. Richmond to try to help resolve the tax liability of Lester Clark Dean. Agent Siegwald and Attorney Richmond suggested an exchange of property, Burns would take a piece of property of supposedly equal value for the High Seas Restaurant. He refused the offer because he did not know how the property was bought by Dean or where it was at.

46. Leroy Burns turned down all plea offers after the indictment in 1986 because, he stated, he knew he was not guilty.

47. Mr. Burns testified that he didn't know his wife's salary while employed, he made $250.00 a week gross straight time prior to his accident. (Government's Exhibits Nos. 57 through 60). The tax returns of the Burns for 1972, 1973, 1975, and 1976 (Government's Exhibit Nos. 57–60 show a joint income of $13,932.60, $14,571.10, $15,179.00, and $9,783.67. The Court notes that the tax returns for each year indicate interest income even though Burns stated he did not trust banks and did not put money in banks until the time of his accident.

48. Mr. Burns denied having any knowledge of open accounts, deposits and withdrawals during much of his marriage to Myrtice.

49. Mr. Burns had a safety deposit box which he rented on October 3, 1975. He visited the box on June 18, 1976, the day he deposited the $51,000.00 in the bank. (Government's Exhibit No. 73). Additionally, he had MasterCards in his name, with his wife and Lester Clark Dean as authorized signers on the cards. This was during this period Dean supposedly disappeared and was not in contact with Mr. or Mrs. Burns.

50. In 1975, the Burns had seventeen bank accounts which consisted of four (4) checking accounts (Government's Exhibits Nos. 1, 2, 3, and 21); four (4) certificates of deposit (Government's Exhibits Nos. 6–9) and nine (9) savings accounts (Government's Exhibit No. 22).

51. In 1975, the bank accounts had an approximate balance of $33,500.00 (Government's Exhibit No. 22) which grew through 1979.

52. The Palmetto Bank and Trust Company checking account # 13–884–3 (Government's Exhibit No. 2) in the name of Leroy and Myrtice Burns shows deposits in 1975 of approximately $14,600.00 and in 1976, approximately $21,500.00 (Government's Exhibit No. 75). In 1976, more than $21,500.00 in checks were written against the checking account (Government's Exhibit No. 2).

53. In 1977, Leroy Burns purchased a boat from Charles Elmore for $7,200.00 cash, which was put in his name. His testimony was that Lester Clark Dean gave him the money to buy the boat because he "could not have anything in his name." Dean told him he had purchased fishing boats and Utah property. The Burns had spent one Christ-

mas in Utah and the trip was financed by Dean.

54. Mr. Burns testified that it bothered him to know that Dean was in the drug business but that neither Lester Clark Dean nor Arlene Bykeefer Dean ever gave him, nor to his knowledge Myrtice, any money.

55. At some point in time, Leroy Burns discovered that Lester Clark Dean and his partners had buried barrels of money on Mr. Burns' "Lakeport" property. Burns poured a concrete slab over the burial site and Dean had to cut it up to get to the money. The concrete slab was done in the early part of 1976 as reflected by the records of Stephen Click (Government's Exhibit No. 55). This was confirmed by Lester Clark Dean who figured that by 1980 he had made $7–8 million in the drug trade and his partners (Giltner, etc.) made pretty much equal amounts. The organization was making so much money they were burying money in large coolers. Leroy Burns told Dean that he, Burns, walked in on O'Keefe and Hayo drying money. Burns got in the truck and left.

56. Regarding the loans supposedly made by Jerome Pratt, his wife and mother on mortgage deeds (Government's Exhibits Nos. 84–87), Leroy Burns asserted that he didn't receive any money. He signed the documents at Pratt's direction and never made any payments on the mortgage deeds. Mr. Burns explained that in 1976–1978 he did not know who constituted By–Gil Corporation, that he entered the restaurant business because Pratt told him he could make more money than in the mini-storage business, and that he trusted Pratt and let him handle all the finances.

57. Mr. Burns surgery was performed prior to Christmas 1977, and he left the hospital prior to Christmas 1977 and was in a body cast until the following March.

58. In 1977, Mr. Burns purchased property from a Mr. Burnett, for a client of Mr. Pratt. The property was put in Burns' name until it was resold to Hammond Harrlee by warranty deed. He paid the property taxes and was reimbursed following sale. There were three (3) pieces of property involved, they paid $12,000.00 for two pieces and sold

all three (3) for $25,000.00. (Government's Exhibit No. 52). Mr. Burns claimed that he got nothing for these transactions but Pratt's continued assistance.

59. At some point in time (apparently in or about 1979) Leroy and Myrtice Burns built a new home. The contractor was William Campbell. The government asserts that the residence cost more than $95,000.00. (Government Exhibit No. 90). Mr. Burns stated that the house cost $72,000.00 originally, then they decided to build it from rock rather than brick. That added $10,000.00 to the cost and he took that amount from some High Seas account, as money he believed was owed to him by By–Gil Corporation. Burns put down $4,000.00 by check at closing and Jerome Pratt gave $12,802.00 to Manatee Federal Savings and Loan Association. He made cash payments to Mr. Campbell ($5,000.00 twice) from money he had saved, but in his previous deposition denied making cash payments (Burns depo.-page 83).

60. Michael Giltner, co-defendant to Lester Clark Dean, denied knowing Leroy Burns in 1977 and denied having given him any part of the $60,000.00 (the 1976 deposit).

61. Giltner admitted to having made about $500,000.00 from the drug trade. He gave his drug proceeds to Mr. Pratt to launder and Mr. Pratt was aware of his occupation. Mr. Pratt would never give him an accounting of where his money went and he suspected that there might be some "skimming" in the management of the restaurant, but with his limited knowledge he was unable to verify that. Mr. Giltner also stated that he thought that there may have been funds juggled between the High Seas Restaurant and the Midnight Sun and that probably drug money went into the Midnight Sun.

62. Dean denied that he gave Leroy Burns any part of the $51,000.00 deposit made in 1976, nor was he aware of the deposit. He knew his mother to be conservative financially, worked two (2) jobs, did not have a mortgage payment.

63. Dean had an interest in By–Gil Corporation through his wife, Arlene Bykeefer whom he married in 1978, and he contributed money to By–Gil. He denied knowing of any

drug money going into the High Seas Restaurant. Dean did admit that from the time he turned himself in on state drug charges, at the end of 1976, until Mr. Pratt died in 1984 he gave Pratt money. For instance, the first time was faced with drug charges, in 1976, he gave Pratt a retainer and money to pay a fine. Thereafter, Dean and co-defendants (Giltner, O'Keefe, Jack Ryan and Hayo) paid Pratt a yearly retainer to represent them.

64. Until he became involved with Mr. Pratt in 1977, Mr. Dean testified that he was pretty conservative with his money. Thereafter, he paid Mr. Pratt a $25,000.00 a year retainer and financed his entire political campaign when he ran for, and won the election for the Florida State House of Representatives. Mr. Dean said he figured that between 1976 and 1980 he gave Mr. Pratt over a million dollars to launder and he never got an accounting for where the money went. Pratt told Dean he used a trust account for the money and that the fund was private and no one could get into it. Dean did know that some of the drug money was invested in the Stumble Inn.

65. Dean said he was privy to information that Mr. Pratt made false loans, false mortgages and set up false corporations to hide the drug proceeds. One such company was Selco, a Jerome Pratt company which was bought in the Cayman Islands. In September 1984, Pratt assigned some mortgage(s) to that entity.

66. In 1974, the Sheriff went to Burns' house looking for Dean.

67. During the time he was out of Manatee County, Dean was in fairly regular contact with O'Keefe, Giltner and Hayo.

68. Dean stated he had no idea how the High Seas Restaurant was constructed or financed. Mr. Pratt was in charge.

69. Willard Campbell is the owner of C & H Builders. He worked on the construction of the High Seas Restaurant, the Midnight Sun and the County Line Bar. He dealt only with Jerome Pratt. The cash he received for the building on the High Seas was received from Pratt.

70. Mr. Campbell also discussed with Jerome Pratt building Mr. Burns home (in 1979) for $120,500.00. He received cash payments from Mr. Burns, which he recalls Burns got from the trunk of his car. The payments were in September and November. Mr. Campbell thought he received $10,000.00 dollars in cash but the records he produced raised an issue of whether there were three (3) $5,000.00 payments.

71. The work on the High Seas consisted of expanding the kitchen and making additions to the lounge. The money ran out at one point and the work stopped for some time but was completed.

72. Mr. Siegwald, a criminal investigator with the Internal Revenue Service, testified that in the Spring of 1979, he began investigating Leroy Burns for possible violations of the code. The investigation continued until the 1986 indictment of Burns.

73. In 1985, there was a meeting at the Hyatt Hotel in Tampa with Judy Hoyer, Assistant United States Attorney; Agent Siegwald; Attorney Richmond representing Lester Clark Dean; Michael Giltner represented by Mr. Jettkins; O'Keefe represented by Mr. Hoffman; Frederick Hayo represented by Mr. Shargill; and Mr. Burns. It appeared to Mr. Siegwald that Attorney Richmond was also representing Mr. Burns. Mr. Siegwald's recollection was that, at that meeting, Mr. Burns felt that he owned 20% of the High Seas Restaurant. This was based on information from Mr. Dean and Mr. Richmond.

74. Mr. Siegwald asserted that Mr. Burns signed a plea agreement changing his plea to guilty on one (1) count of tax fraud but no signed copy of the supposed plea can be found. Siegwald claimed that the plea was signed albeit reluctantly by Burns.

75. Mr. Siegwald also stated that the following offers were made to Burns: 1) plea to misdemeanor and forfeit the High Seas Restaurant and 2) the government would drop all charges if Burns would forfeit the High Seas. No agreement was reached and finally all charges were dropped against Mr. Burns.

## DISCUSSION OF THE LAW

■ Petitioner brings this action challenging a forfeiture which has been ordered by this Court, pursuant to plea agreements between the government and Lester Clark Dean and Michael Giltner (Docket Nos. 227 and 422), by virtue of, and pursuant to, 21 U.S.C. § 853, governing criminal forfeitures. Because plea agreements are involved in the instant action, the law of contract would govern the overall forfeiture. However, it is important to understand the statutes under which the forfeitures have been sought. Such understanding is necessary because the terms of those statutes can be used in interpreting ancillary issues which are not specifically spelled out within the four corners of the plea agreement. An example of such an issue is third party interests.

Throughout the lengthy period within which this, and related matters, have been before this Court, there have been references in various motions, to both criminal forfeiture, pursuant to § 853, and civil forfeiture, pursuant to 21 U.S.C. § 881. These references have been made by both the petitioners and the respondent. At times, it has been unclear, solely by reference to the various documents, which properties were being forfeited under which statute. A short discussion of the difference between these two statutes, as they apply to the instant action, is in order.

■ Civil forfeiture under § 881 is an *in rem* action directly against the subject property. These forfeitures are descendants of the deodand. "At common law the value of an inanimate object directly or indirectly causing the accidental death of a King's subject was forfeited to the Crown as a deodand. The origins of deodand are traceable to Biblical and pre-Judeo-Christian practices, which reflected the view that the instrument of death was accused and that religious expiation was required." *Austin v. United States,* — U.S. ——, ——, 113 S.Ct. 2801, 2806, 125 L.Ed.2d 488 (U.S.1993) (quoting O. Holmes, *The Common Law,* c. 1 (1881)). Conceptually, civil forfeiture is not punishment for the alleged criminal, but an action directly against the guilty property. This concept has generated much controversy which is reflected in current case law and expressed in various law review articles. Section 881(a)(6) directs civil forfeiture of "[a]ll ... things of value furnished ... by any person in exchange for a controlled substance in violation of this subchapter, [and] all proceeds traceable to such an exchange ..." 21 U.S.C. 881(a)(6).

■ On the other hand, criminal forfeiture is an *in personam* action against the alleged criminal. Under section 853, any person *convicted* under this or other subchapters is subject to forfeiture under § 853(a)(2) of "any property constituting, or derived from, any *proceeds* the person obtained, directly or indirectly, as the result of such violation ..." (emphasis added). Because this is essentially the same language as found in § 881, it is apparent that a particular piece of property could be reached, in many cases, under either of these statutes depending on whether the government is pursuing an *in personam* or an *in rem* action. A distinction worth noting, at this point, is that a civil forfeiture may occur without regard to a criminal conviction, whereas a criminal forfeiture may *only* be commenced following a criminal conviction.

■ The first reference to § 881 was made in the plea agreement between Lester Clark Dean and the government, paragraph 1(g) (Docket No. 227). Although mildly ambiguous, this Court interprets that reference to § 881 as having been intended to apply only to the forfeiture of the conveyances mentioned previously in subparagraph (g) and not to the assets described in the attached lis pendens. The lis pendens, which relates to the subject forfeiture, aids this Court in this interpretation by stating, twice, that it is being brought under § 853. This interpretation becomes important because the petitioners and the government have not, at all times during these proceedings, been in agreement as to which of these two statutes govern the parties' rights in the instant forfeiture action.

In petitioners' motion, styled "Objection to Attempted Forfeiture and Motion for Prompt Post–Seizure Probable Cause Hearing" (Docket No. 502), petitioners attempt to raise

issues under the framework of § 881 and specifically cite to § 881 in paragraph 7. In its response, styled "Response to Objection to Attempted Forfeiture and Motion for Prompt Post–Seizure Probable Cause Hearing" (Docket No. 504), second paragraph, the government states that, "Defendant Dean has agreed by his plea agreement that the property referred to ... is subject to forfeiture under the provisions of 21 U.S.C. §§ 848 and 853." While the government's claim here is not totally evident from the face of the plea agreement, this Court finds that Mr. Dean did agree to be governed under the terms of § 853 by virtue of the incorporation of the lis pendens by reference, within paragraph 1(g), which specifically cites § 853.

Third party interests, if any, in the instant action will, therefore, be governed by 21 U.S.C. § 853. Section 853(n), entitled "Third party interests," subparagraph (6) states:

> (6) If after the hearing, the court determines that the petitioner has established by a *preponderance of the evidence* that—
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance with its determination. (emphasis added) 21 U.S.C. § 853(n)(6)(A) and (B).

 Petitioners carry the burden of proof, and, in order to prevail in this proceeding, must show, by a preponderance of the evidence, that they have an ownership interest in the High Seas Restaurant which was acquired by them with legitimate funds rather than with any drug proceeds. Furthermore, their alleged ownership interest must be shown to be superior to the government's interest, which vested at the commission of the crimes admitted to by the defendants in their plea agreements. To show superior interest, petitioners must show that they were not simply nominee owners of Lester Clark Dean as is alleged by the government.

 Alternatively, petitioners, using the same burden and standard of proof, must show that they were bona fide purchasers for value, not nominee owners, who at the time of purchase were reasonably without cause to believe that the property was subject to forfeiture. Actual lack of knowledge of forfeitability is not enough. "The proper test to be applied under the statute is not merely whether the petitioner[s] had knowledge of forfeitability of the asset but whether the petitioner *reasonably* held the belief that the property was not subject to forfeiture." (emphasis added) *United States v. Reckmeyer*, 836 F.2d 200, 204 (4th Cir.1987).

The majority of petitioners' evidence consists of oral testimony. In order for this Court to make a determination, then, it is first necessary to assess the credibility of the testimony. The evidence which is found to be credible must then be weighed to determine whether it meets the preponderance test set forth above.

The evidence spans a considerable amount of time, and this Court takes notice of the fact that the elapsed years may have had an effect on the memories of some of the witnesses. Notwithstanding that fact however, this Court is unable to reasonably draw many of the conclusions prayed for by the petitioners. Because the conclusions of this Court must be based on factually intensive matters, a discussion of some of the factual issues is in order.

Two key sub-issues here are, whether the $51,000.00 deposited by Leroy Burns into the Palmetto Savings and Loan Association were tainted funds, and whether Leroy and Myrtice Burns were merely nominee owners of the High Seas Restaurant? An affirmative answer to either one of these questions is dispositive. The Court is convinced that

both of these questions is answered in the affirmative. Another sub-issue which speaks to the credibility of the petitioners' testimony is, were the petitioners truly ignorant of Lester Clark Dean's activities in the drug trade? The Court cannot accept as credible such a claim.

■ Mr. Burns' contention that he did not trust banks is inconsistent with the fact that in 1975, Leroy and Myrtice Burns had seventeen bank accounts. Furthermore, even if this court accepts that Leroy and Myrtice Burns were the most frugal couple in Florida, the amount of cash which was supposedly put away between 1958 and 1976 and expended between 1976 and 1986 is inconsistent with the legitimate incomes claimed by the petitioners. Mr. Burns claimed to have saved $17,000.00 by 1958 which remained in his mother's mattress until her death in 1977. Therefore, the entire $51,000.00, which was deposited in June, 1976, as well as the many other cash disbursements made by Burns, had to be saved from income generated between 1958 and 1976. This could only be possible if Mr. and Mrs. Burns saved **more than** $4,250.00 each and every year between 1958 and 1976, in the years when the claimed legitimate incomes were sometimes under $10,000.00. The claim of such a yearly savings from the incomes declared by the petitioners is not found by this Court to be credible. Why did Burns have no explanation for multiple visits to his safety deposit box which coincided with the dates of cash bank deposits? Why did Mr. Burns tell some individuals, including this Court, that he saved the $51,000.00, yet he told several other individuals that he found the money?

■ Mr. Burns admits to investing a down payment of $6,000.00 cash for the High Seas original land tract and securing a loan for the $54,000.00 balance. He admits to securing a $120,000.00 loan for the construction of the High Seas. The balance required to complete the original contract price for the construction was approximately $39,000.00. Mr. Burns admits that this money had to have come through Jerome Pratt; however, its source was unknown to him as was the source of many other funds which were later invested in the High Seas Restaurant. Mr. Burns admits to securing a loan to finance the amount due under the original restaurant furnishings contract. The amount of the loan was approximately $87,000.00. However, again, the balance of approximately $28,000.00 came through Mr. Pratt and its source was unknown. Why did the alleged sole owner of the High Seas Restaurant not question the source of these funds, and why would Mr. Pratt contribute large amounts of money to an endeavor which was solely owned by his client? Why would Mr. Burns, who admittedly participated in other sham transactions with Pratt, not question the authenticity of the transactions surrounding his only present and future source of income, the High Seas Restaurant?

These inconsistencies are, but a few examples of the many unanswered source of funds questions which are replete throughout the evidence. Two alternate conclusions are suggested. Assuming for a moment that this Court totally accepts Mr. Burns version of the examples cited above, that Mr. Pratt provided all of the balance of required funds from unknown sources, the only reasonable conclusion is that Leroy and Myrtice Burns were nominee owners. On one hand Mr. Burns claims that he is the sole legal owner of the High Seas, but on the other hand, he admits that thousands and thousands of dollars from unknown sources (through Jerome Pratt) were also invested into the restaurant.

■ In the alternative, assuming for a moment that all of the funds which were invested in the High Seas actually belonged to Leroy and Myrtice Burns, the only reasonable conclusion is that, because they have not established that they legally earned the large amounts of cash which were invested in the High Seas, and it is unreasonable to conclude that they could have, the money must have come from drug proceeds.

Mr. Burns testified that he leased the restaurant to By–Gil Corporation for $5,400.00 per month, which was purportedly paid until the 1983 sale. He further testified that the lease agreement called for an additional amount to be paid equal to 1% of the gross, which was never paid to Burns. He pro-

duced no evidence to suggest that he ever pursued or collected this substantial amount of money. Additionally inconsistent is the fact that the lease agreement, which was offered into evidence (Petitioner's Exhibit No. 21), called for a monthly lease payment of $5,000.00 plus the excess of 7½% of the gross profit over the fixed lease payment. Michael Giltner testified that the restaurant grossed 1.5 million dollars the first year. Under the lease scenario testified to by Leroy Burns, By–Gil owed him an additional $15,000.00. Under the scenario in the lease agreement in evidence, the additional amount due from By–Gil for the first year would have been $52,500.00. Mr. Burns would have this Court believe that as the sole owner of the High Seas Restaurant, he never lifted a finger to pursue the collection of one or the other of these significant amounts of money? Indeed, why would Mr. Burns, as legitimate owner, have been satisfied with asserting claim to the lesser amount when the lease agreement entitled him to the greater?

Mr. Burns testified that when the restaurant was sold to Robert Fusco a down payment was made by Mr. Fusco of $225,000.00. Yet the evidence has shown that Mr. Burns received about 20% of that money after expenses. If Leroy and Myrtice Burns were the sole owners of the High Seas Restaurant, rather than merely nominee owners, why was 80% of down payment on its sale given to others, when there is no evidence that Mr. Burns owed the monies to Giltner, Dean or Pratt?

Lester Clark Dean testified that he gave Leroy Burns $10,000.00–$12,000.00 for the purchase of an airboat for Dean. Evidence has shown that the boat cost $7,200.00. What happened to the balance of the money?

Mr. Burns was so uncertain of so many things, yet he is certain that no drug proceeds were ever invested in the High Seas Restaurant. Leroy and Myrtice Burns both contend that they had no idea that Lester Clark Dean was involved in the drug trade until Dean was actually arrested on state drug charges. Mr. Burns testified that Dean disappeared from the end of 1971 until 1976 due to an argument between the two. Mr. Burns alleges that there was no contact between he and Dean during that period. Why, then, was Dean authorized to charge on Burns' MasterCard account? Why, then, was Dean given access to various Burns bank accounts? Where did Mr. Burns think that Mr. Dean acquired the money buried under the concrete floor of Burns' boathouse? Dean testified that Burns admitted walking in on two Dean associates as they were drying money. Where did Burns think the money came from? Although Lester Clark Dean testified that there was little or no accounting by Mr. Pratt for millions of dollars of his drug proceeds, he is certain that no drug proceeds were ever invested in the High Seas Restaurant. How can he be sure when he admittedly had *no* control or information regarding that money?

These are examples of the general lack of credibility this Court finds throughout the evidence. To discuss all of the evidence fully would require that the length of this order be more unwieldy that it presently already is, and more than is necessary. Sufficient discussion has been proffered to acquaint the petitioners with this Court's difficulty in finding a preponderance of their evidence to be credible. Based on the evidence presented in this matter, this Court makes the following Conclusions of Law:

## CONCLUSIONS OF LAW

1. This is a proceeding to adjudicate the validity of Petitioners Leroy and Myrtice Burns third-party interest in property, known as the High Seas Restáurant, forfeited under plea agreements between the United States and Lester Clark Dean and Michael Giltner.

2. Third-party interests under the agreement are determined' pursuant to 21 U.S.C. § 853(n).

3. All right, title and interest vests in the United States upon commission of the act giving rise to forfeiture. 21 U.S.C. § 853(c).

4. Petitioners, Leroy and Myrtice Burns, have failed to prove by a preponderance of the evidence that they have a right, title or interest in the property which is superior to the government's.

5. Petitioners, Leroy and Myrtice Burns have failed to prove by a preponderance of the evidence that they were bona fide purchasers for value and reasonably without cause to believe that the property was subject to forfeiture.

## CONCLUSION

The High Seas Restaurant was forfeited pursuant to a plea agreement brought under the criminal forfeiture statutes, and petitioners Leroy and Myrtice Burns have failed to prove by a preponderance of the evidence either of the requirements contained in 21 U.S.C. § 853(n)(6). Accordingly it is

**ORDERED** that judgment shall be entered **in favor** of the Respondent, United States of America and **against** the Petitioners' Leroy and Myrtice Burns, for forfeiture of The High Seas Restaurant.

**DONE AND ORDERED.**